____ FILED ____ ENTERED
____ LOGGED ____ RECEIVED

10:19 am, Jan 25 2024

AT  BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CASE NO. _____ 24-191-ADC |
| | * | 24-192-ADC |
| KELLY BOWERS, | * | UNDER SEAL   24-193-ADC |
| a/k/a "Buck," | * | 24-194-ADC |
| LEONARD SIMMS, | * | 24-195-ADC |
| a/k/a "Gooch," | * | 24-196-ADC |
| ISIAH NAYLOR, | * | |
| a/k/a "KP," | * | |
| AMBER NAYLOR, | * | |
| RAHEEM ALLSUP, | * | |
| a/k/a "Radio," and | * | |
| KEITH WILLIAMS, | * | |
| a/k/a "GM," | * | |
| | * | |
| Defendants. | * | |

*******

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS

Your affiant, Jenna Klausing, a Special Agent with the Federal Bureau of Investigation,

being duly sworn, deposes and states as follows:

### I.   INTRODUCTION AND BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI").  As such I

am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure

41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly

authorized by the Attorney General to request a search warrant.  I am also an "investigative or law

enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United

States Code, that is, an officer of the United States empowered by law to conduct investigations

of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.     I have been a Special Agent with FBI since October of 2019. I have received training in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, violent incident crimes, search warrant applications, and various other crimes.  Since March of 2020, I have been assigned to work in the Baltimore Field Office, Annapolis Resident Agency, which investigates all federal criminal matters for Anne Arundel, Calvert, Charles, St. Mary's, Queen Anne's, and Kent counties, Maryland.

3.     I submit this Affidavit in support of a criminal complaint and arrest warrants for KELLY BOWERS, LEONARD SIMMS, ISIAH NAYLOR, AMBER NAYLOR, RAHEEM ALLSUP, and KEITH WILLIAMS (collectively the "TARGET SUBJECTS").  Based upon the facts in this Affidavit, I respectfully submit that there is probable cause to believe that the TARGET SUBJECTS engaged in a conspiracy to distribute and possess with intent to distribute controlled dangerous substances, in violation of 21 U.S.C § 846 (the SUBJECT OFFENSE).

3.     This Affidavit is based upon my participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of obtaining a criminal complaint and arrest warrants, it does not include every fact learned during this investigation, but I have not excluded any facts known to me that would defeat a determination of probable cause.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. In making this Affidavit, I am relying only on the facts stated herein.

4.     Information in this Affidavit does not always set forth my personal observations, but rather at times reflects information from reports as well as information provided to me by other

law enforcement agents who observed the events described and to whom I have spoken or whose reports I have read.

## II.    PROBABLE CAUSE

5.      In 2019, the Annapolis Police Department ("APD") initiated an investigation into Newtowne 20, a violent criminal enterprise ("VCE") located in the Annapolis area of Maryland. Annapolis has seen a spike in violence and drug-related calls for service out of the neighborhood known as Newtowne to include numerous overdoses from controlled dangerous substances ("CDS"), as well as several shootings—many resulting in the death of intended and unintended individuals. The neighborhood consists of the Woodside Gardens Apartment complex and the surrounding areas on Julianna Circle in Annapolis, Maryland.

6.      In 2020, the FBI began assisting the APD and the Anne Arundel County Police Department ("AACPD") in their investigation of several violent crimes and drug cases associated with individuals, who claim the Newtowne area as their primary residence (hereinafter "the Newtown 20 DTO"). Many of these individuals were further identified as distributing drugs as their primary sources of income. Investigators have learned through search warrants, confidential sources, surveillance footage, arrests, and a recent federal wiretap investigation that many of the Newtowne 20 DTO members distribute drugs in this community.

7.      Investigators identified some of the individuals involved in the DTO, including the **TARGET SUBJECTS**, and used a variety of investigative tools to learn more about the DTO, including the review of toll data, pen register data, GPS tracker information, social media, CCTV footage, grand jury subpoenas, confidential sources, and undercover officers. Additionally, as more fully discussed below, on September 18, 2023, the Honorable Lydia K. Griggsby, United States District Judge for the District of Maryland (Judge Griggsby), authorized the interception of

3

communication over multiple phones, including **TARGET SUBJECT BOWERS,**[1] **TARGET SUBJECT SIMMS,**[2] and **TARGET SUBJECT I. NAYLOR**[3]. The federal wiretap is ongoing but is set to terminate on February 11, 2024.

8.      Based upon the information developed during the investigation, I believe that probable causes exists that the Newtowne 20 DTO, including the **TARGET SUBJECTS** sell heroin and/or fentanyl, cocaine, as well as crack cocaine in Woodside Gardens and the surrounding areas in Annapolis and Anne Arundel County, in violation of the **SUBJECT OFFENSE**.

### A.      FEDERAL WIRETAP INVESTIGATION

9.      As noted above, the federal wiretap investigation was authorized on September 18, 2023.  Judge Griggsby authorized the interception of several phones to include phones used by **TARGET SUBJECTS BOWERS, ALLSUP, SIMMS and I. NAYLOR**.  The phones intercepted included the following:

    a.      240-432-8174 (hereinafter referred to as 8174) used by BOWERS;

    b.      410-212-2345 (hereinafter referred to as "2345") used by BOWERS;[4]

    c.      443-942-5238 (hereinafter referred to as 5238), believed to be used by ALLSUP and later confirmed to be used by SIMMS; and

    d.      443-922-0708, (hereinafter referred to as 0708) believed to be used by I. NAYLOR.

---

[1]      Bowers was believed to use two phones during the investigation 240-432-8174, identified during the wiretap as Target Telephone 1 and 410-212-2345 identified during the wiretap as Target Telephone 2.

[2]      Simms was believed to use 443-942-5238, identified during the wiretap as Target Telephone 3.

[3]      I. Naylor was believed to use 443-922-0708, identified as identified during the wiretap as Target Telephone 4.

[4]      Interceptions of 2345, BOWERS second intercepted phone was terminated on December 7, 2023.

7.     During these intercepted communications, investigators intercepted wire and electronic communications between the **TARGET SUBJECTS**.   During these intercepted communications, investigators believe that the **TARGET SUBJECTS** were discussing drug trafficking with each other as well as associates and customers.

### B.     TARGET SUBJECTS

#### 1.     KELLY BOWERS

8.     Investigators believe BOWERS to be a leader and organizer of the Newtowne 20 DTO and conspires with other members to distribute drugs.  Investigators intercepted him over the telephones ending in 8174 and 2345 discussing drug trafficking with his associates as well as customers.  Below are a few examples of intercepted communications.

9.     On September 19, 2023, at approximately 10:47 p.m., BOWERS received a call over 8174 from an individual identified as Justin Reitz, who used telephone number (443) 370-5640.  The conversation between BOWERS and Reitz, in relevant part, occurred as follows:

BOWERS:         Yo.

REITZ:            Yeah you in for the night?

BOWERS:         Say it again.

REITZ:            I said are you in for the night?

BOWERS:         I waiting on um one thing come through here, I got the boy and got the girl but I'm just waiting on the soft to come in.

REITZ:            Alright, I just needed some boy but if uh you know (unintelligible)if you able, if not I understand.

BOWERS:         Where you at in the house?

REITZ:            Yeah of course.

BOWERS:         I'm a have to come up there, huh?

5

| | |
|---|---|
| REITZ: | Oh, course. I'll send you some extra, I don't know. |
| BOWERS: | Could we do it in the a.m. before I drop my daughter at school? |
| REITZ: | I go to work, I go to work at six thirty. |
| BOWERS: | Yeah she go to school at seven o'clock, she in high school. |
| REITZ: | Alright then. |

10.    Based upon my training and experience, I believe Reitz asked BOWERS if BOWERS was still out conducting drug deals, "You in for the night?" BOWERS responded that he was waiting on a re-supply of drugs, "I waiting on um on thing come through here..." Investigators believe that BOWERS said he had heroin (boy) and crack cocaine (girl) for sale, but he was waiting to get a new supply of powder cocaine (soft) to sell, "I got the boy and got the girl but I'm waiting on the soft to come in." Based upon my training and experience, "boy" is believed to be a slang for heroin and "girl" is believed to be a slang for cocaine, and "soft" is believed to be a slang for powder cocaine. Investigators believe that Reitz was waiting on a re-supply and BOWERS and Reitz made plans to meet for a drug deal the following morning, when BOWERS asked, "Could we do it in the a.m....?" Reitz responded, "Alright then."

11.    On October 8, 2023, BOWERS was intercepted talking to a known drug customer, Michael Donaldson. During this call, Donaldson contacted BOWERS and coordinated a drug transaction. The conversation occurred as follows:

| | |
|---|---|
| BOWERS: | Hello. |
| DONALDSON: | Yo, can you meet me at uh? |
| BOWERS: | What is convenient for you? Say that again. |
| DONALDSON: | Where is a good place for me for you because I'm up in, I'm up in Wayson's Corner now. |
| BOWERS: | You up in Waysons? |

6

DONALDSON:      Yeah

BOWERS:         Go over there by my shit.

DONALDSON:      What by wha?

BOWERS:         Go over there by my crib.

DONALDSON:      Aight.

BOWERS:         How long you going to be to get there?

DONALDSON:      Could you meet uh… can you meet me at the Arby's?

BOWERS:         Yeah I be right there.

DONALDSON:      Aight.

BOWERS:         How long

DONALDSON:      How long till you get there?

BOWERS:         How long it take you to get there?

DONALDSON:      Probably 15 minutes

BOWERS:         Alright, I'm going to be like 20 minutes, bro. I'm coming all the way
                from Annapolis.

DONALDSON:      Alright, alright.

BOWERS:         Alright, I be up there in 20 minutes. You say 15.

DONALDSON:      Yup. Alright.

BOWERS:         Alright.

DONALDSON:      I need 100 of the girl.

BOWERS:         Alright.

   12.    Based on my training and experience, I believe Donaldson asked BOWERS for
cocaine - "100 of the girl."

   13.    On October 12, 2023, Donaldson called BOWERS to coordinate another drug
transaction. The call begins occurred as follows:

7

| BOWERS: | Hello. |
|---------|--------|
| DONALDSON: | Hey what's up bro? |
| BOWERS: | What's up my baby boy my mother fucking girl broke my phone yo. |
| DONALDSON: | Really? |
| BOWERS: | Hell yeah I had about fifty mother fucking calls and text messages when I got this bitch cut back on. |
| DONALDSON: | Oh, you know you know where the Dollar General is and if the the Wayson's Corner by Sands Road? |
| BOWERS: | Yeah. |
| DONALDSON: | Yeah I live I live up here now bro. |
| BOWERS: | So what? you want me come down there? |
| DONALDSON: | Yeah, could you? |
| BOWERS: | Yeah I need uh hey you said I gave you the soft you ain't did you put it together. |
| DONALDSON: | No no dude I can't. |
| BOWERS: | I fucked around, you still got it? |
| DONALDSON: | Hell no dude, I burnt it up trying to make hard. |
| BOWERS: | Oh Lord have mercy, Mike. You going to have to come hang with me for about two weeks bro. By the time you leave… |
| DONALDSON: | Yo like half of it had like like like it worked like it worked for like a .2 and then after then everything after that just went to shit. |
| BOWERS: | I got you bro. I'm gonna make… I got you bro. |
| DONALDSON: | Alright. |

14. Based on my training and experience, I believe BOWERS and Donaldson discussed cooking cocaine to make cocaine base or "crack cocaine." When Donaldson said, "I burnt it up trying to make hard," I believe BOWERS originally provided Donaldson cocaine "soft" and

Donaldson tried to cook it into crack.  Further, I believe BOWERS told Donaldson that he (BOWERS) could teach Donaldson by suggesting that he, "come hang with me for about two weeks," and then later told him "I got you bro."  Based on this conversation and others like it, I believe BOWERS and Donaldson have an ongoing drug dealing relationship.

15.     On November 27, 2023, investigators from AACPD conducted a traffic stop of a Nissan Cargo Van registered to and used by BOWERS. AACPD officers observed the driver, later identified as BOWERS, conduct a hand-to-hand transaction near 130 Hearne Road in Annapolis with a female known to the officers as a CDS-user.  When officers initiated the traffic stop, BOWERS refused to stop and continued to drive to an adjacent shopping center.  Eventually, BOWERS stopped and was ordered to exit the vehicle.  A second officer detained the female and recovered drugs from her.  As the officer approached the vehicle, he observed a white rock like substance on the driver's seat which field tested positive for cocaine.  During a subsequent search of the van, officer recovered two plastic bags containing a pink substance from two separate cups containing liquid in the center console of the van.  Investigators believed the pink substance to be suspected heroin/fentanyl.  Officers believed that BOWERS attempted to destroy the CDS when he avoided initially stopping for the traffic stop.  The two recovered bags contained approximately 67 grams (gross) suspected cocaine.  The chemical analysis remains pending. The CDS recovered from the female was approximately .83 grams of cocaine (crack).  Officers arrested BOWERS for the drug offense, but he was released later that night.

### 2.     ISIAH NAYLOR and AMBER NAYLOR

16.     During these intercepted communications, investigators intercepted several calls and text messages between BOWERS and other Newtowne DTO associates to include ISIAH.

NAYLOR and SIMMS. During these intercepted communications, investigators believe that BOWERS coordinated drug transactions between BOWERS and his associates and customers.

17.     For example, on October 8, 2023, at approximately 10:00 a.m., investigators intercepted a call between BOWERS, using 8174, and I. NAYLOR, using 0708. A summary of the relevant part of the conversation is described below:

| | |
|---|---|
| BOWERS: | Alright, I'mma come up up with you in a second. You trying to sell a bag for me? |
| I. NAYLOR: | You said sell a what? |
| BOWERS: | A bag of the girl. |
| I. NAYLOR: | I got you. I ain't gonna sell you no gas. I'm ready. I'm – where you at? |
| BOWERS: | I'm gonna worry about what I use to worry about down the water. |
| I. NAYLOR: | Bro where you used to live at right on the bay? |
| BOWERS: | Nah nah, right over here by the uh yacht club. |

18.     Based on this call, I believed based on my training and experience, that BOWERS asked NAYLOR to sell a "bag" or quantity of "girl" for him because he was broke. Investigators know "girl" to mean cocaine in this instance, and the "bag" would be a distribution amount of cocaine.

19.     Investigators believe that I. NAYLOR and AMBER NAYLOR stash drugs at their shared residence, 43 Clay Street, Unit B, Annapolis, MD 21403, and engage in drug trafficking together. As discussed in more detail below, investigators captured on CCTV footage of both I. NAYLOR and AMBER NAYLOR dealing drugs out of their residence after coordinating said transactions over the phone (which was intercepted through the wiretap investigation).

20.     Investigators conducted physical surveillance numerous times of I. NAYLOR.  On October 27, 2023, for example, investigators observed AMBER NAYLOR driving I. NAYLOR in their vehicle.  Investigators observed I. NAYLOR engage in two suspected drug transactions with known drug customers. The first occurred at the Gold Leaf Dispensary parking lot in Annapolis, where Joshua Anderson,[5] a known drug customer, interacted with I. NAYLOR.  Based upon the duration of the meeting, where Anderson approached the car and then shortly thereafter left the area, investigators believed that the two engaged in suspected drug transaction. Approximately one hour later, investigators observed a suspected second transaction where AMBER NAYLOR drove I. NAYLOR to a business, College Hunks Hauling Junk and Moving in Annapolis. After a few moments, Michael Sweeney, a known drug customer, approached their vehicle, had a brief interaction with AMBER and I. NAYLOR, then walked to his (Sweeney's) vehicle, and placed an unidentified object inside.  Sweeney then entered College Hunks, and I. NAYLOR and AMBER NAYLOR left the area. Like the last interaction, investigators were unable to observe a physical hand-to-hand transaction, but given the short duration of the meeting, I believe they engaged in a drug transaction.

21.     During the investigation, investigators continued to conduct physical and video surveillance.  On November 16, 2023, at approximately 9:50 p.m., I. NAYLOR coordinated a drug transaction using 0708 with a customer, where I. NAYLOR dropped the CDS for the customer from the window of his residence, 43 Clay Street, Unit B, Annapolis, MD 21403.  CCTV video captured the incident in a screenshot below:

---

[5]     Anderson was identified as a drug customer through previous interceptions made over 8174 with BOWERS. At the time of this transaction, investigators believed Anderson purchased narcotics from I. NAYLOR because BOWERS was out of town.



22.     Investigators learned during the investigation that AMBER NAYLOR used I. NAYLOR's phone ending in 0708 to text that she was the "lady" to an unknown female drug customer and that she (AMBER NAYLOR) could sell drugs for him (I. NAYLOR) on his behalf while he was in jail at the Jennifer Road Detention Center.[6]

23.     During his incarceration, investigators intercepted several calls between AMBER NAYLOR and suspected drug customers.

24.     For example, on December 13, 2023, AMBER NAYLOR used 0708 to coordinate a drug transaction. I. NAYLOR gave AMBER NAYLOR instructions to turn on his phone. On

---

6       On December 11, 2023, ISIAH NAYLOR was arrested for a violation of probation warrant related to his 2018 conviction for a traffic violation. He was later released on December 15, 2023.

December 13, 2023, at 10:10 a.m., AMBER NAYLOR sent a message from 0708 to a drug customer (unknown female or "UF") – "Gm it's the lady 120 for the ball right so we on the same page". The UF responded, "Babe I didn't even hear the text I got 120 can I come and get it now". The UF then called 0708, and AMBER NAYLOR answered. The conversation occurred as follows:

| | |
|---|---|
| A.NAYLOR: | Hel... (clears throat)... hello |
| UF: | Yes ma'am. |
| A.NAYLOR: | Huh? |
| UF: | Can I come and get the uh, 8 ball? I got the... I got straight money. The right money. |
| A.NAYLOR: | Alright. |
| UF: | Okay, call... can I come down and start walking? |
| A.NAYLOR: | Yeah. |
| UF: | Alright babe. Thanks. |
| A.NAYLOR: | Mmmhmm. |

25.     Based upon my training and experience, I believe the refence to "8-ball" is coded wording for approximately three and a half grams of CDS. A few minutes later, CCTV captured an UF, believed to be the drug customer discussed above – "can I come down and start walking?". The UF was observed at the front door of I. NAYLOR and AMBER NAYLOR's residence. The UF reached inside the door and handed something to an individual inside then immediately received something in return. The UF concealed the item from the view of the camera and quickly left the area. I believe, based on the intercepted communication, that AMBER NAYLOR distributed drugs to the UF from I. NAYLOR and AMBER NAYLOR's residence. Further, after intercepting additional calls throughout the day, I further believe that the CDS that AMBER

13

NAYLOR was selling was cocaine and that AMBER NAYLOR participated in drug trafficking activities of the DTO in I. NAYLOR's absence.

### 3.   LEONARD SIMMS

26.   Investigators believe SIMMS to be an associate of BOWERS, who distributes drugs on behalf of the Newtowne 20 DTO.  SIMMS was intercepted during the federal wiretap using the phone ending in 5238.

27.   On September 30, 2023, at 10:50 a.m., investigators intercepted a call between BOWERS, using 8174, and SIMMS, using 5238. A portion of the call, in relevant part is described below:

BOWERS:   Yo.

SIMMS:   Hey I need a half.

BOWERS:   alright, you already at home, you said?

SIMMS:   Yeah.

BOWERS:   Alright, I'm ready come over there.

SIMMS:   Alright.

39.   Based upon my training and experience, I believe SIMMS asked BOWERS for a "half" of CDS, likely cocaine or heroin. "Half" is a common term to mean "half" a gram, ounce, or kilogram.  In this instance, investigators believe SIMMS referred to a "half" of an ounce to distribute to other customers.  On December 13, 2023, I believe SIMMS coordinated drug trafficking activities with Derek Dioso (202-568-0359).  During the call, Dioso called SIMMS over 5238. The pertinent portion of the phone call occurred as follows:

SIMMS:   Whatchu, whatchu wanting?

DIOSO:   Whole joint.

14

| SIMMS: | Aight. Um, I'm trying to think of a spot so you can meet me somewhere like... you you you can pull at you in that... |
| DIOSO: | Right. |
| SIMMS: | That you need a tow truck. |
| DIOSO: | You tell me where. I'll get it in there. Wanna go up to the BP? |
| SIMMS: | Yeah yeah that's cool. I'ma put it... |
| DIOSO: | That way... |
| SIMMS: | I'mma put the shit in a box of cigarettes for you. |

40.     Based upon my training and experience, I believe SIMMS and Dioso coordinated a drug transaction. When SIMMS asked Dioso what he wanted, Dioso stated, a "whole" joint, I believe Dioso referenced to a certain quantity of drugs, such as a gram, ounce, etc., believed to be either heroin or cocaine.

28.     Additionally, SIMMS met with an undercover officer on three occasions and distributed suspected heroin to the UC each time and drove his vehicle, a GMC Terrain to the meeting locations. Specifically, SIMMS met the UC on November 27, 2023, December 12, 2023, and recently on January 10, 2024. During each of those buys, SIMMS contacted the UC and during the conversation the two discussed the quantity of drugs that the UC was going to purchase and the meeting location.

29.     On November 27, 2023, the UC purchased approximately one gram of suspected heroin from SIMMS for $90.00. During that transaction, the UC inquired about getting a better price, and SIMMS stated that if the UC purchased more next time, he could give the UC a better price. SIMMS told the UC he could do $250-$300 for a "ball."[7]

---

7     "Ball" is a common term meaning 3.5g of CDS.

30.     On December 12, 2023, the UC purchased approximately one gram of suspected heroin from SIMMS, but then they later discussed an additional amount, 3.5 grams of suspected heroin concealed in an iPhone box, which the UC purchased from SIMMS for $290.  During the third transaction, the UC purchased 3.5grams of heroin ("ball") for $285.00 on January 10, 2024. The UC contacted SIMMS over 5238.  The chemical analysis of all three controlled buys are still pending.

### 4.     RAHEEM ALLSUP

31.     Based upon the significant contact between ALLSUP and BOWERS, investigators believe they are working together in their drug trafficking conspiracy.  ALLSUP is also believed to be a drug trafficking associate of SIMMS and is believed to be a member of his immediate family.

32.     On October 12, 2023, investigators initiated surveillance of ALLSUP at his residence. ALLSUP exited the residence and entered a blue Chevrolet Malibu and drove away from the residence, ALLSUP made several stops around Severn, MD, to include a residence and two gas stations. ALLSUP then drove to Old Mill Senior High and parked near the tennis courts. A few minutes later, a dark-colored pickup truck parked next to the Malibu.  ALLSUP exited the Malibu and approached the passenger side of the truck.  ALLSUP interacted briefly with the occupant of the truck, returned to his vehicle, and left the area. Surveillance continued on the pickup truck.  Investigators identified Jean Fertil[8] as the owner of the vehicle. The vehicle then picked up a child from the high school sports field and drove away at a high rate of speed to 1713 Carriage Circle in Severn - an address registered to Jean Fertil.  Fertil was later identified as a drug

---

[8] Fertil was convicted of second-degree assault in 2009, CDS: Possession-Marijuana in 2012; and Trespassing on Private Property in 2019.

customer of SIMMS through wire intercepts. Based upon my training and experience, I believe ALLSUP and Fertil completed a drug transaction due to the brief nature of their interaction.

33.     On November 30, 2023, ALLSUP called SIMMS over 5238.  The conversation, in relevant part, occurred as follows:

| | |
|---|---|
| ALLSUP: | Bro. |
| SIMMS: | Hey, whats up bro. Hey, you get them joints today, yo. |
| ALLSUP: | What? |
| SIMMS: | The jigs. |
| ALLSUP: | Oh your play? |
| SIMMS: | Yeah, I'm right here with him. |
| ALLSUP: | What he ready get? |
| SIMMS: | you already know, the 15. |
| ALLSUP: | Oh yeah, shit I forgot bro. |
| SIMMS: | (U/I) |
| ALLSUP: | How many of them he got? |
| SIMMS: | They gonna get the whole script bro. |
| ALLSUP: | Aight, where you at? Where I need to meet you at to get em? |
| SIMMS: | Nah, not right now. Bro, I'm down here meeting him for something else. He go 11:30, you call him (U/I). |
| ALLSUP: | Oh aight bet that's a bet let me know then bro. |
| SIMMS: | Aight. |
| ALLSUP: | Aight, good looking. |

34.     Based upon my training and experience, I believe that the reference to "jiggs" meant pills, likely oxycodone, and the "15" is believed to be a reference to the dosage.

17

Investigators believe that SIMMS contacted ALLSUP to sell 15mg of oxycodone pills which SIMMS acquired.

35.    A follow-up conversation occurred shortly thereafter, at 10:55 a.m., where SIMMS received another phone call over 5238 from ALLSUP, who was using a phone ending in 3248. During the call, I believe ALLSUP asked SIMMS about the same pills as before, and SIMMS estimated that his "people" would have 100 pills to sell.  While the kind of pill was not yet determined, SIMMS and ALLSUP discussed "jiggs" and "15s," which I believed referenced oxycodone pills.

36.    In another call, SIMMS and ALLSUP further discussed drug trafficking. For example, on December 3, 2023, at 6:21 p.m. SIMMS received a call from ALLSUP, using 3248, over 5238. Below is the conversation:

SIMMS:          Yo?

ALLSUP:         Hey bro?

SIMMS:          What's up?

ALLSUP:         I'm gonna give you thirty dollars for a half a (U/I)

SIMMS:          Yeah I know ... I just ... I'm on my way up the road.

ALLSUP:         Alright ... just call me when your getting off 32.

SIMMS:          Alright.

ALLSUP:         Alright.

37.    Based on this intercepted communication, I believed SIMMS and ALLSUP  met to exchange a "half" of CDS for $30. Given the price, $30 would likely be for half a gram of CDS, most likely cocaine or heroin.  SIMMS then made another call to ALLSUP approximately 11 minutes later saying to meet him at the Exxon which is located off of "32." Investigators know

that Highway 32 is the main highway connecting Severn to Annapolis, Maryland. I believe SIMMS and ALLSUP met at the Exxon to exchange the "half" of drugs.

      5.   **KEITH WILLIAMS**

38.    Investigators believe WILLIAMS to be a primary supplier of the Newtowne 20 DTO. Investigators believe WILLIAMS supplies not only SIMMS, but others both inside and outside of the Newtowne community. Investigators have intercepted communications between SIMMS and WILLIAMS engaging in drug trafficking.

39.    For example, on November 29, 2023, at approximately 5:22 p.m., SIMMS called WILLIAMS over 443-534-4146 (hereinafter referred to as "4146"). The relevant part of the conversation occurred as follows:

| | |
|---|---|
| WILLIAMS: | Yo what's up with the dude, cuz? |
| SIMMS: | Everything, everything |
| WILLIAMS: | Yeah, I got that boy too, cuz. |
| SIMMS: | I'm straight on that right now though, whenever I see I'll holler at you, bro. |
| WILLIAMS: | Alright bet baby, I was getting ready to say everything everything, where you at? |
| SIMMS: | Right (U/I) I came back up the road, but I'm ready my (U/I) I'm ready to come back around for it. |
| WILLIAMS: | Alright bet, just call me. I'm waiting on it. What you trying to do? |
| SIMMS: | Put the half time put the half time yo for me. |
| WILLIAMS: | Alright, bet, you wanted soft right? |
| SIMMS: | Yeah. |
| WILLIAMS: | Alright. |

40.     Based upon my knowledge of the investigation, as well as my training and experience, I believe that in this conversation, WILLIAMS offered heroin ("boy") to SIMMS; however, SIMMS did not currently need to resupply his heroin.  SIMMS then asked for the "half time," and WILLIAMS asked if SIMMS wanted the "soft."  Based upon my training and experience, I believe "half time" is a unit of measure, oftentimes half an ounce.  I also know "soft" often refers to powder cocaine as opposed to "hard" or crack cocaine.

41.     SIMMS, using 5238, called WILLIAMS, over 4146, on the same day, at 5:47 p.m. (November 29, 2023).  In this call, I believe SIMMS asked WILLIAMS if he was going to send somebody from the Newtowne neighborhood where WILLIAMS resides.  I know, based upon my training and experience, that drug traffickers use "runners" or third parties to deliver their narcotics to avoid being identified by law enforcement.  I also know drug traffickers often conduct narcotics transactions away from their residences to eliminate suspicion that they may be keeping drugs inside their residences.

42.     Shortly thereafter, on November 29, 2023, at 6:05 p.m, SIMMS, using 5238, called WILLIAMS again. The conversation occurred as follows:

WILLIAMS:  Yo.

SIMMS:        (U/I) Ready to bring somethin?

WILLIAMS:  I'm ready send Becker up there.

SIMMS:        Alright. Tell em come on the left side.

WILLIAMS:  Alright.

43.     Immediately following this call, the GPS tracker installed on SIMMS's vehicle[9] showed that the vehicle travelled to an area just outside of the Newtowne neighborhood and parked. I believe that SIMMS instructed WILLIAMS to tell his "runner", Becker, where to go to complete the CDS transaction. The GPS vehicle data later indicated that the vehicle left the area at approximately 6:12 p.m. Based upon the intercepted call and short duration of this meeting, I believe that the runner, "Becker" picked drugs up from SIMMS. Furthermore, I believe based on my training and experience, that drug transactions oftentimes are completed in a short time-frame to limit any exposure to law enforcement.

44.     Between December 15, 2023, and January 18, 2024, there have been 48 calls between SIMMS and WILLIAMS. Each call is similar in nature. SIMMS calls WILLIAMS requesting cocaine or heroin, in coded words, "boy" or "girl." SIMMS's vehicle then travels to the same location just outside of the Newtowne neighborhood, WILLIAMS then either sends a "runner" or meets SIMMS himself, and then SIMMS drives away. This is known through ping data and vehicle tracking data.

45.     For example, on December 15, 2023, at approximately 6:18 p.m., WILLIAMS using 4146 called SIMMS on 5238 and said that he is "right behind [him]" in the "burgundy joint". Investigators reviewed camera footage from CCTV cameras in the area and observed an individual, believed to be WILLIAMS, who can be seen leaving in a burgundy or dark red minivan at approximately 6:16 p.m. then returning a few minutes later and entering an apartment in Building 712 on the top floor, believed to be his residence. Investigators believe that WILLIAMS

---

9     On December 1, 2023, the Honorable Charles D. Austin signed a warrant authorizing the installation and monitoring of a GPS tracking device on a vehicle known to be used by SIMMS, a black GMC Terrain.

exited his residence before the call with SIMMS and left in the burgundy minivan to meet with SIMMS.

46.     On January 10, 2024, at 12:26 p.m. prior to SIMMS meeting with the UC, SIMMS called WILLIAMS. Specifically, after the UC contacted SIMMS to purchase a "ball" of heroin, SIMMS then coordinated with WILLIAMS to meet before meeting the UC. The call occurred as follows:

| | |
|---|---|
| WILLIAMS: | Yo, what's up cuz (yells at someone in the background) |
| SIMMS: | Sup man. Where you at? |
| WILLIAMS: | Down the way. |
| SIMMS: | How long you gon be cuz? |
| WILLIAMS: | Man, (U/I), I'm makin my stir fry right this second bro. Shoot, where you at? |
| SIMMS: | Man, I'm on 665. I need one, one of the homie real quick. |
| WILLIAMS: | Alright. Alright. |
| SIMMS: | My man, he want more, so whole time he ain't gotta dime. |
| WILLIAMS: | Alright, gotta wait a couple minutes. My food is on the stove. |
| SIMMS: | Yeah, I'ma wait for you. (U/I) |
| WILLIAMS: | Na don't sit up through there. I'll come to like CVS or somethin. |
| SIMMS: | Alright. |
| WILLIAMS: | Alright. |

47.     Based upon my training and experience, I believe "stir fry" was a coded reference to "crack cocaine," and when WILLIAMS said his "food [was] on the stove," I believe WILLIAMS was cooking crack during the phone call.  During the call, when SIMMS asked WILLIAMS for one of the "homie," I believe that was a reference to heroin (which is what the

UC requested to purchase from SIMMS). WILLIAMS then told SIMMS he would meet him at CVS; however, their meeting location changed after multiple police vehicles were observed near the CVS. WILLIAMS and SIMMS then discussed meeting at a nearby gas station for the CDS exchange. This exchange is caught on camera.

48.     Immediately following the deal with WILLIAMS, SIMMS drove to meet the UC and provided approximately 3.5 grams of suspected heroin which is currently pending lab results. WILLIAMS then immediately returned to his residence as indicated by the same license plate reader and CCTV footage in the Newtowne Neighborhood.

### III.     CONCLUSION

49.     Based on the foregoing, I respectfully submit that there is probable cause to issue the requested criminal complaints and arrest warrants for the TARGET SUBJECTS KELLY BOWERS, LEONARD SIMMS, ISIAH NAYLOR, AMBER NAYLOR, RAHEEM ALLSUP, and KEITH WILLIAMS.

**Jenna Klausing** Digitally signed by Jenna Klausing
Date: 2024.01.23 13:10:52 -05'00'

_____
Jenna Klausing, Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this _____24th_____ of January 2024.

_____
Honorable A. David Copperthite
United States Magistrate Judge
District of Maryland

23